**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**BOBBY ROBINSON,**

      Petitioner,

    v.            Case No. 10-C-465

**ROBERT HUMPHREYS,**

      Respondent.

---

**DECISION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

---

**I. FACTS AND PROCEDURAL HISTORY**

In addition to running a small business out of his home selling rock salt in the winter and doing demolition work in the summer, Kirk Daniel ("Daniel") kept an eye on his neighborhood. Naturally, his vigilance was not appreciated by the neighborhood's thugs. When he reported a drug house, all the windows in his trucks were broken out. When he chastised children for throwing bottles at his neighbor's dog in October of 1996, a child returned with his uncle who confronted Daniel. The confrontation culminated in a neighborhood gunfight with numerous people shooting at Daniel and Daniel returning fire.

On the evening of Christmas Day of 1996, Daniel was lying on his couch and watching TV while Patsy King ("King"), whom he referred to as his common-law wife after having been together for more than 13 years, was washing dishes in the kitchen. The sound of someone trying to pull open his locked storm door caught Daniel's attention and he went to investigate. At his door he encountered three black males, each of whom wore stocking caps on their heads and neoprene face

masks covering the lower half of their faces. The males at the door seemed startled by Daniel's appearance but when Daniel asked what they wanted, one said they wanted to buy some salt. Daniel pointed to his business' signs indicating that the business was closed. The trio began to leave and one of the males said they would return in the morning. After they had left, Daniel noticed that they had left the gate to his property open, and he went outside to close it.

When Daniel returned to his house, King asked him if there had been a customer at the door. Daniel told her what had happened and they agreed that the incident seemed odd. Daniel returned to the couch and King went to close the home's interior door, which they normally left open. As she went towards the door, there was a loud boom that Daniel recognized as a shotgun blast. Daniel felt as if he had been punched in the face, and as he looked towards his wife he saw her fall backwards, crying out, "Why? Why? Why?" There was now a large hole in the Plexiglas of the storm door and Daniel saw a hand reaching through that hole trying to unlock the door. Daniel reached for his handgun that was on the coffee table and discharged all 7 rounds from his .380 towards the intruder. After Daniel's first few shots the hand retreated.

Daniel went to his fallen wife who had suffered a close range shotgun wound to her abdomen and was bleeding profusely. Daniel had also been struck by buckshot in his left thigh, arms, and face. When emergency personnel arrived, both King and Daniel were transported to the hospital. King died from her wounds that evening; Daniel was treated and released.

Suspecting that the persons involved in the murder might be the same people with whom Daniel had the prior dispute that led to the October shootout, a house in the neighborhood where these individuals were thought to reside was pointed out to the police. On the morning of December 26, 1996, less than 12 hours after the shooting, detectives contacted the individuals inside this residence. One of the individual inside the residence was the petitioner, Bobby Robinson

("Robinson"), who was 14 years old at the time. Robinson, who was known as O.G. for "Original Gangster," was arrested after he gave a false name to the police and was identified as a runaway.

Over the course of the next roughly day-and-a-half, Robinson remained in custody and was interrogated three separate times for a total of nearly 8 hours. Eventually, Robinson admitted he was part of the group that went to Daniel's home with the intention of robbing him. When King came to the door, Robinson was on the porch pointing a sawed-off shotgun at King. Robinson pumped the shotgun and the gun fired. When it fired, Robinson turned and ran. When he continued to hear shots, he thought the sawed-off shotgun in his hand was continuing to fire and so he tossed it aside. He eventually made it to the home where he was later arrested.

Robinson was charged as an adult with various crimes related to this offense, pled not guilty, and proceeded to trial. The first trial ended with a hung jury. (Ans. Ex. J at 13.) During the second trial, halfway into Robinson's testimony, Robinson chose to accept the state's offer where in exchange for his plea of no contest to the charge of first degree reckless homicide, other charges would be dismissed. (Ans. Ex. J at 13-14.) Robinson pled no contest, was adjudged guilty, and was sentenced to 40 years in prison. (Ans. Ex. J at 14.)

Robinson initially did not appeal but on September 6, 2007, the court of appeals reinstated Robinson's appellate rights. (Ans. Ex. J at 14; Ans. Ex. H; Docket No. 11 at 3-4.) Robinson then filed a motion for post-conviction relief challenging the voluntariness of his confession, the effectiveness of trial counsel with respect to suppression of the confession, the adequacy of the plea colloquy, and the court's sentence. (Docket No. 11 at 5; Ans. Ex. I.) After the circuit court denied Robinson relief, (Ans. Ex. I), Robinson raised these four issues on appeal, (Ans. Ex. I). The court of appeals denied Robinson's appeal, (Ans. Ex. M), and on November 12, 2009, the Wisconsin Supreme Court denied review, (Ans. Ex. P).

On June 1, 2010, Robinson filed the present petition pursuant to 28 U.S.C. § 2254 wherein he contends that (1) his statements were involuntary; (2) the police should have offered him a more detailed explanation as to what his Miranda rights meant; (3) his trial counsel was ineffective for failing to fully challenge the admissibility of Robinson's statements; and (4) his plea was not knowing, intelligent, and voluntary.

This matter was randomly assigned to this court and all parties have consented to the full jurisdiction of a magistrate judge. (Docket No. 4, 7.) Following this court's screening order in accordance with Rule 4 of the Rules Governing Section 2254 Cases, (Docket No. 5), the respondent answered the petition, (Docket No. 10), and Robinson has replied, (Docket No. 13). Therefore, the pleadings are closed and the matter is ready for resolution.

The respondent acknowledges that Robinson's petition is timely, (Docket No. 11, ¶5), and that he has exhausted his state remedies with respect to the claims he raises in his petition, (Docket No. 11, ¶13.) Therefore, the court must consider the merits of Robinson's claims.

**II. STANDARDS OF REVIEW**

> Under the Antiterrorism and Effective Death Penalty Act (AEDPA), [a federal court] may grant a petition for habeas relief from a state court judgment only in one of two limited circumstances: if the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Smith v. Grams, 565 F.3d 1037, 1043 (7th Cir. 2009).

The court shall presume that the state court's factual determinations are correct, and the petitioner may rebut this presumption only be clear and convincing evidence. Id. (citing § 2254(e)(1)). The petitioner "bears the burden of showing that the state court's finding of fact or its application of federal law was not only erroneous, but unreasonable." Id. (citing Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009); Sturgeon v. Chandler, 552 F.3d 604, 609 (7th Cir. 2009)).

4

Under the "unreasonable application" prong of (d)(1), it is not enough for the federal court to simply disagree with the conclusion of the state court; the state court's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. Middleton v. McNeil, 541 U.S. 433, 436 (2004); Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

## III. ANALYSIS

### A. Statements

Prior to being subject to custodial interrogation, an individual must generally be advised of and voluntarily waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Here, with respect to his inculpatory statement, there is no dispute that Robinson was advised of his rights. Rather, the only question is whether Robinson's decisions to waive his rights to remain silent and to counsel were voluntary. (See, e.g., Docket No. 15-8 at 222-23.)

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal citations and quotation marks omitted).

There were two Miranda hearings in this matter. The first occurred shortly before Robinson's first trial in 1997. Robinson did not testify at this hearing. The second, where Robinson did testify, was part of the post-conviction proceedings after his appellate rights were restored in 2008.

Following Robinson's arrest on the morning of December 26, 1996, Robinson was interrogated three times. The first interrogation began at approximately 9:30 A.M. and occurred in an interrogation room in the Police Administration Building. (Docket No. 15-4 at 36.) The detective testified he advised Robinson of his rights by reading them from a pre-printed card and Robinson

5

said he understood his rights and was willing to talk. (Docket No. 15-4 at 38-39.) At the second hearing, Robinson testified that he was never advised of his rights by this first detective. (Docket No. 16-7 at 13.) This first interrogation lasted about two-and-a-half hours and throughout, Robinson denied any involvement in the shooting. (Docket No. 15-4 at 43.) Robinson described the detective as polite, and he seemed to accept Robinson's answers. (Docket No. 16-7 at 13-14.) Robinson was then returned to his cell where he was isolated from other inmates, with no one to talk to and nothing to do, (Docket No. 16-7 at 16-17), and Robinson alleges he was not provided with food. A detective testified that it is standard practice to keep juveniles isolated from adult prisoners in the city jail, and that all inmates are served breakfast, lunch, and dinner. (Docket No. 16-9 at 30-31.)

Later that evening, at about 7:10 P.M., a different detective again interrogated Robinson. (Docket No. 15-4 at 51-52.) Robinson was again advised of his constitutional rights and he again indicated he understood and agreed to waive these rights. (Docket No. 15-4 at 52-54.) He was asked if he wanted anything to eat or drink, which he declined. (Docket No. 16-10 at 45.) Robinson testified that this detective asked Robinson largely the same questions that he was asked previously. (Docket No. 16-7 at 20.) Initially the detective appeared to accept Robinson's answers but as he asked the same questions over and over, he grew more "stern." (Docket No. 16-7 at 20-21.) Robinson stated that he was afraid and he "just wanted to go home." (Docket No. 16-7 at 22.) He testified that he asked multiple times to call his guardian but the detective ignored him. (Docket No. 16-7 at 25.) According to Robinson, he was never offered any food throughout his confinement and thus had not eaten since the prior day. (Docket No. 16-7 at 21.) The second interrogation ended around 9:30 P.M. (Docket No. 16-7 at 23.) Robinson was returned to his isolated cell where he was not able to sleep comfortably because he "didn't want to be there" and because the cell was cold. (Docket No. 16-7 at 24.)

6

The third interrogation was led by yet another detective, Detective Michael Valuch, and began the following day at roughly 7:30 P.M. According to Robinson, he still had not been provided with food. (Docket No. 16-7 at 26.) He was exhausted and frightened. (Docket No. 16-7 at 26.) Again, Robinson was advised of his rights, which he waived. (Docket No. 15-4 at 73-74.) Robinson testified that he did not understand his rights; he thought they just meant he was in trouble. (Docket No. 16-7 at 36-37.) He also testified that at the time of his first <u>Miranda</u> hearing he was illiterate and he "didn't really understand anything, especially when using law terms." (Docket No. 16-8 at 9.) The detective was initially polite but when Robinson gave an answer he seemed not to like, "he seemed to get a little frustrated so he moved his chair right next to" Robinson's. (Docket No. 16-7 at 32.) Again, Robinson alleges his requests that he be allowed to contact his guardian were ignored. (Docket No. 16-7 at 34.) Robinson was scared and began to cry during the interview. (Docket No. 16-7 at 34, 36.) Robinson alleges that Detective Valuch told Robinson that if he would tell the truth, he could go home. (Docket No. 16-7 at 34.) Robinson understood this to mean that Detective Valuch wanted him say he was involved in the shooting and then he would be allowed to go home, and so Robinson gave an inculpatory statement. (Docket No. 16-7 at 35.) During this interview, Robinson was provided with two cheeseburgers and soda. (Docket No. 16-7 at 35.)

> Robinson contends his statement was not voluntary.
>
> He points to his young age, the lengths of the interviews and the conditions of the room where he was interviewed, the length of time he had been in custody with no contact with his family, the fact that no explanations were given to him as to what the <u>Miranda</u> rights meant, his poor educational levels, his chaotic family background, his low intelligence and his limited prior experience with police as reasons that would have tipped the scale in his favor. In addition, he claims that he was frightened of the police, exhausted, and he cried during the third interview, indicating he was overwhelmed by the police.

(Ans. Ex. M, at ¶16; <u>see also</u> Docket No. 2 at 12-13.) The court of appeals affirmed the trial court's conclusion that Robinson was properly advised of his <u>Miranda</u> rights, understood them, and voluntarily waived those rights. (Ans. Ex. M, at ¶7.)

7

Despite being a couple weeks shy of his 15th birthday, Robinson was no stranger to the criminal justice system. Although Robinson alleges he had not been interrogated as part of his prior arrests, the fact that Robinson had previously spent time in custody places Robinson in a different position than a juvenile facing the police for the first time. Similarly, the fact that a juvenile was not afforded the opportunity to contact a family member might be significant in the voluntariness analysis for many juvenile defendants, but this factor is entitled to minimal weight in Robinson's case in light of the fact he was a runaway at the time of his arrest.

Although Robinson was subject to a total of roughly 8 hours of interrogation, this interrogation was broken up into three parts, each between approximately two-and-one-half hours to three hours, with ample time between each interview to permit Robinson to regain his composure. (Ans. Ex. M at ¶18.) Also relevant in the totality of the circumstances is the fact that each interrogation was conducted by a different detective, and each detective advised Robinson of his rights at the beginning of each interview.

This court's review of the record reveals that there was clearly a reasonable basis for the state court's decision not to credit Robinson's testimony. For example, Robinson testified at the Miranda hearing that he was held in custody for over a day without ever being offered food. (Docket No. 16-7 at 21.) However, this allegation is contradicted not only by the testimony of a detective, (Docket No. 16-9 at 31), but also by Robinson himself who testified during his first trial that he was offered food but chose not to eat, (Docket No. 15-9 at 40).

Moreover, the objective evidence does not support Robinson's claimed intellectual deficiencies. Pretrial testing indicated that Robinson's intellectual abilities fell within the low average range without any mental or psychological illness that would have prevented him from understanding his Miranda rights. (Ans. Ex. M at ¶19.) And contrary to his claims that he was

illiterate, Robinson exhibited little difficulty in reading portions of police reports at trial. (Ans. Ex. M at ¶19; see also Docket No 15-9 at 32, 52.)

A final example as to why it was reasonable for the state court to not credit Robinson's testimony is the fact that Robinson's melodramatic characterizations of the interviews as "torture," (Docket No. 15-9 at 39-40), and the interview room as a "torture room" (Docket No. 15-9 at 62; 16-4 at 95), are not supported by the record. The only specific conduct that might arguably support this hyperbolic characterization are the facts Robinson was asked the same questions multiple times, (Docket No. 15-9 at 39-40), and although the detectives were generally polite, at one point, one detective appeared more "stern," (Docket No. 16-7 at 21), and another "seemed to get a little frustrated so he moved his chair right next to" Robinson's, (Docket No. 16-7 at 32). Notably, Robinson considered being subject to cross-examination at his first trial to be equivalently tortuous. (Docket No. 15-9 at 39-40.)

Having reviewed the record in this matter, the court is unable to say that the court of appeals' conclusion was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. In the absence of any demonstrated coercive conduct by the police, it was certainly reasonable for the state courts to conclude that despite Robinson's age, under the totality of the circumstances, Robinson's statement was voluntary. Accordingly, Robinson is not entitled to relief on this claim.

Robinson's related contention that he is entitled to relief because the police failed to explain what each of his Miranda rights meant, (Docket No. 1 at 6), is without merit. In order for a state inmate to obtain relief by way of a federal petition for a writ of habeas corpus, he must point to a specific United States Supreme Court precedent that conflicts with the result of the state court

9

proceedings; novel arguments can never form the basis for habeas relief under § 2254. Wright v. Van Patten, 552 U.S. 120, 126 (2008). The fact that the police did not offer a more detailed explanation of the Miranda warnings is just one of many factors that must be considered under the totality of the circumstances.

The United States Supreme Court has never held that the police must explain the meaning of the Miranda rights to juvenile arrestees. Cf. Fare v. Michael C., 442 U.S. 707, 725 (1979) ("This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so."). And Robinson does not contend that the United States Supreme Court has ever held that a juvenile must be afforded a more detailed explanation of his rights. Robinson contends merely that this should be the law. A § 2254 petition is not an appropriate vehicle for advancing arguments about what the law should be. Thus, this argument must fail.

### B. Ineffective Assistance of Counsel

A petitioner seeking relief pursuant to 28 U.S.C. § 2254 due to an alleged denial of the effective assistance of counsel must demonstrate that the state court's decision on this issue was contrary to or involved an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). Wright v. Van Patten, 128 S. Ct. 743 (2008) (per curiam). Under Strickland, a petitioner is entitled to relief only if he can prove the following two elements. Goodman v. Bertrand, 467 F.3d 1022, 1027 (7th Cir. 2006). First, the petitioner must prove that his counsel's performance was unreasonable. In assessing the reasonableness of counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Raygoza v. Hulick, 474 F.3d 958, 962 (7th Cir. 2007) (quoting Strickland, 466 U.S. at 689). A court assessing the reasonableness of an attorney's performance must be cautious not to

view counsel with the distorted perspective offered by hindsight; rather, every effort must be made to evaluate an attorney's performance from the perspective of counsel at the time. Strickland, 466 U.S. at 689. An attorney's actions do not become unreasonable simply because they proved unsuccessful. Id.

Second, the petitioner must prove that this unreasonable conduct prejudiced his defense. It is not enough for petitioner to show that the attorney's error had "some conceivable effect on the outcome." Raygoza, 474 F.3d at 962-63 (quoting Strickland, 466 U.S. at 693). But on the opposite side, it is not necessary for the petitioner to demonstrate that the error more likely than not altered the outcome of the case. Id. Rather, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694).

Robinson contends that his trial counsel was ineffective for failing to fully challenge the admissibility of his statements. (Docket No. 1 at 8.) Robinson's trial attorney did seek to suppress the statements but Robinson contends that it was unreasonable and prejudicial for his attorney to not present all the facts in favor of suppression. Specifically, Robinson contends that his trial counsel should have presented evidence of Robinson's low IQ, limited literacy, and additional facts related to the circumstances under which he had been questioned. (Docket No. 2 at 16-18.)

In light of the analysis set forth above, this argument requires little discussion. After a full hearing at which Robinson's post-conviction counsel presented all the evidence that Robinson contended his trial attorney unreasonably failed to present, the state court determined that it would nonetheless have denied Robinson's motion to suppress. Because the motion to suppress would have been denied anyway, Robinson's trial attorney was not ineffective for failing to present all the facts initially.

For the reasons set forth above, this court is unable to conclude that the state court's decision that Robinson's statement was admissible was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Because this court is unable to upset the state court's conclusion that Robinson's statement was properly admitted even upon consideration of the evidence Robinson's trial attorney failed to present initially, this court is likewise unable to upset the state court's conclusion that Robinson's trial attorney was not ineffective for failing to present this additional information. Therefore, Robinson is not entitled to relief with respect to this claim.

**C. Plea**

Robinson contends that his no contest plea to first degree reckless homicide was involuntary because the trial court misinformed him that the crime of first degree reckless homicide included a circumstance where the gun went off accidentally. (Docket No. 1 at 9.) In essence, Robinson contends that his plea was involuntary because "the trial court misinformed him as to what actions constituted the crime." (Ans. Ex. M at ¶29.)

"A plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'" Bousley v. United States, 523 U.S. 614, 618 (1998) (citing Brady v. United States, 397 U.S. 742, 748 (1970)). A plea is not "intelligent unless a criminal defendant first receives 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" Id. (quoting Smith v. O'Grady, 312 U.S. 329, 334 (1941)). If a defendant is misinformed about the elements of the crime to which he is pleading guilty, his plea is not intelligently made. Id.

Prior to accepting his plea, the court engaged in an extensive colloquy with Robinson that included Robinson confirming that he understood the elements of the crime to which he was

pleading no contest. (Docket No. 16-4 at 119.) When amidst the colloquy Robinson denied having any involvement in the victim's death and stated he was pleading guilty only because of the weight of the state's evidence, the court engaged in a discussion with counsel and the defendant as to whether Robinson's plea was actually an Alford plea, see North Carolina v. Alford, 400 U.S. 25 (1970), rather than a no contest plea. (Docket No. 16-4 at 125-28.) But when the court explained that Robinson was not charged with intentional homicide but instead was charged with reckless homicide, Robinson acknowledged that he was pointing the sawed-off shotgun at the victim to scare her when the gun went off. (Docket No. 16-4 at 128.) With this acknowledgement, the court accepted his no contest plea.

Although Robinson does not fully develop the argument in his present filings, based upon the briefs Robinson filed in state court, it is clear that Robinson's present argument rests upon the following exchange that occurred during the plea colloquy.

> THE DEFENDANT: You say I tried to do it intentionally?
>
> THE COURT: No. Recklessly. The charge is first degree reckless, that you while using a dangerous weapon recklessly caused a death of another, pointing a gun, I assume, and it went off. Why it went off, we don't know. No one knows through the testimony if you're trying to scare someone *or it went off by accident* but you were pointing the gun at that point.
>
> THE DEFENDANT: Yes.

(Docket No. 16-4 at 128 (emphasis added).)

Robinson contends that contrary to the trial court's statement, as a matter of law, if the gun went off by accident, Robinson could not have been convicted of first degree reckless homicide. (See, e.g., Ans. Ex. J at 36-38.) If the accidental discharge cannot constitute first degree reckless homicide, then as a result of the court's statement, Robinson was misinformed about the nature of the charges against him and his plea was not intelligently made.

The court of appeals rejected Robinson's argument. The crime of reckless homicide is divided into first and second degrees in Wisconsin. See Wis. Stat. §§ 940.02; 940.06. Second degree reckless homicide requires only criminal recklessness, in that "the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk," Wis. Stat. § 939.24, whereas first degree reckless homicide requires proof that the death resulted "under circumstances which show utter disregard for human life."

Relying upon factually analogous case law, the court of appeals concluded that Robinson's admitted conduct of pointing a sawed-off shotgun at the victim at close range while he stood on the porch with the intention of robbing her, particularly when he knew the gun was functional and had not checked to ensure it was unloaded, was conduct that showed an utter disregard for human life. (Ans. Ex. M at ¶¶32-33.) Thus, even if the gun went off accidentally, Robinson's conduct amounted to first degree reckless homicide. Accordingly, the court's statement was not an inaccurate recitation of the law, and therefore Robinson was not misinformed of the nature and elements of the charge against him.

The court is unable to conclude that the decision of the court of appeals was unreasonable, and therefore Robinson is not entitled to relief on this claim. As a preliminary matter, the court notes that Robinson's plea came amidst his second trial. Unlike most defendants, Robinson had the benefit of having listened to the full jury instructions as part of his first trial, (see Docket No. 15-9 at 105-09), and therefore was particularly well-informed about what the state must prove in order to convict him of first degree reckless homicide.

As for the allegedly inaccurate statement by the trial court, the court's suggestion that an accidental discharge of a firearm under the facts of this case could constitute first degree reckless homicide was an accurate statement of the law. It is not necessary for the state to prove that Robinson intentionally pulled the trigger in order to convict Robinson of first degree reckless

14

homicide; if the state could prove that Robinson intentionally pulled the trigger, Robinson would likely be guilty of first degree intentional homicide. See Wis. Stat. § 940.01. It was only because it was possible that the shotgun discharged accidentally that Robinson was charged with the lesser offense of reckless homicide.

**IV. CONCLUSION**

For the reasons set forth above, Robinson's petition for a writ of habeas corpus shall be denied. Robinson has failed to demonstrate that the court of appeals' conclusion that under the totality of the circumstances his statements were voluntarily given was unreasonable. Because the evidence demonstrates that Robinson's statements were voluntary, Robinson's attorney was not ineffective for omitting certain evidence at Robinson's initial Miranda hearing. Finally, there is no evidence that Robinson was misinformed about what the state must prove in order to convict him of first degree intentional homicide, and thus the court finds no basis to conclude that Robinson's plea was knowingly, intelligently, and voluntarily made.

In accordance with Rule 11 of the Rules Governing Section 2254 Cases, the court concludes that Robinson has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C. § 2253(c)(2), and therefore denies Robinson a certificate of appealability.

**IT IS THEREFORE ORDERED** that Robinson's petition for a writ of habeas corpus is **denied**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a certificate of appealability is **denied**.

Dated at Milwaukee, Wisconsin this 4th day of January, 2011.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge